```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
        ISAAC MORALES,                          16CV7389
                Plaintiff,

        -against-                               COMPLAINT
                                                UNDER THE
                                                CIVIL RIGHTS ACT
City of New York for Riker's Island,            42 U.S.C. § 1983
Captain Greaves, Shield #376,                   (Prisoner Complaint)
Captain(s) "John/Jane Doe," Shield #???,
of AMKC Facility (C-95) at Riker's Island
whom were on duty during the time(s) of
incident(s), Correction Officer Dutch,
Shield #???, of AMKC Facility (C-95),           Jury Trial Requested
Correction Officer Gray, Shield #18367, of
AMKC Facility (C-95), Deputy Warden(s)
"John/Jane Doe," Shield #???, of AMKC
Facility (C-95) at Riker's Island whom
were on duty during the time(s) of the
incident(s), Deputy Warden(s) "John/Jane
Doe," Shield #???, of Riker's Island,
Warden(s) "John/Jane Doe," Shield #???, of
AMKC Facility (C-95) at Riker's Island whom
were on duty during the time(s) of the
incident(s), Warden(s) "John/Jane Doe,"
Shield #???, of Riker's Island.
                Defendant(s).
------------------------------X
```

## I. Parties in the Complaint

1. I, ISAAC MORALES, (B&C#241-150-7561), am the Plaintiff in the above-referenced action, and am currently detained, and/or was currently being detained during the time(s) of the incident(s), at the AMKC Facility (C-95), located at 18-18 Hazen Street, East Elmhurst, New York 11370, at Riker's Island.

2. Riker's Island is geographically located in East Elmhurst, (Queens County), within the City of New York, with the Bronx County Having jurisdiction, within the City of New York.

3. Defendant Captain Greaves, Shield #376, of the AMKC Facility (C-95) at Riker's Island, was, and/or is the Captain of that facility, acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

4. Defendant(s) Captain(s) "John/Jane Doe, Shield #???, of the AMKC Facility (C-95) at Riker's Island, was and/or is the Captain(s) assigned/of that facility, acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

5. Correction Officer Dutch, Shield #8264, of the AMKC Facility (C-95) at Riker's Island, was and/or is a correction officer assigned/of the facility, acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

6. Correction Officer Grey, Shield #18367, of the AMKC Facility (C-95) at Riker's Island, was and/or is a correction officer assigned/of the facility, acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

7. Defendant(s) Deputy Warden(s) "John/Jane Doe," Shield #???, of the AMKC Facility (C-95) at Riker's Island, was and/or is the Deputy Warden(s) assigned/of that facility, acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

8. Defendant(s) Deputy Warden(s) "John/Jane Doe," Shield #???, of Riker's Island, was and/or is the Deputy Warden(s) assigned/of the Riker's Island facility(ies), acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

9. Defendant(s) Warden(s) "John/Jane Doe," Shield #???, of the AMKC Facility (C-95) at Riker's Island, was and/or is the Warden(s) assigned/of that facility, acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

10. Defendant(s) Warden(s) "John/Jane Doe," Shield #???, of Riker's Island, was and/or is the Warden(s) assigned to the Riker's Island facility(ies), acting under color of state during the time(s) of the incident(s), located at 18-18 Hazen Street, East Elmhurst, New York 11370.

## II. Statement of Facts

11. On or about September 16, 2015, after being arraigned in Bronx Supreme Court, I, the Plaintiff, ISAAC MORALES (herein mentioned as "Plaintiff"), was taken into custody by the Department Correctional Services (D.O.C.S.), and housed as a detainee at the Anna M. Kross Center (A.M.K.C. Facility, also known as "C-95"), located at 18-18 Hazen Street, East Elmhurst, New York 11370 at Riker's Island, where plaintiff has been detained/housed to-date.

12. During the period(s) between September 17, 2015; and, December 2015, "services" (as described in the 'Inmate Handbook') copy enclosed, and which the general population of detainees/inmates are entitled to, such as "Law Library"; and, "Sick Call" services, have not been called, and/or otherwise offered without any reasonable explanation, "TSO" (facility lockdown/shutdown), and/or facility alarm/alert, that would otherwise warrant a "NO MOVEMENT", as per the 'Department of Correction Inmate Handbook', revised 2007, page 21, entitled "Health Services", marked herein as "Exhibit C"; and, page(s) 23-24, entitled "Law Library: Legal Reference Materials and Supplies", marked herein as "Exhibit D".

13. Since plaintiff first arrived at the A.M.K.C. Facility (C-95), located at 18-18 Hazen Street, East Elmhurst, New York 11370, back on September 17, 2015, plaintiff had been complaining about an aching back, due in large part to the matress plaintiff had been subjected to sleeping upon at night, even presenting this medical condition/issue to the doctor(s) here at "Sick Call", to no avail.
The issue was never addressed and/or documented by the facility doctor(s), despite being told that plaintiff's name was added to the "Physical Therapy" list, held/located at the "West Facility" (hospital) here at Riker's Island.
Plaintiff had not been called to physical therapy toodate, and the mattress itself, which is manufactured by: 'Bob Barker Co Inc.", located at: 7925 Purfoy Road, Fuquay-Farina, NC 27526, has a labe on it (Prototype ID: PJM25754-1; Model No. JV30754GDBL), which clearly indicates/reads . . . "THIS MATTRESS IS INTENDED TO BE USED <u>WITHOUT A FOUNDATION</u>". However, the/this mattress had been continuously placed on a metal foundation despite the instructions of the warning label (herein enclosed as "Exhibit(s) "A"; and, "Exhibit A-1").
Furthermore, plaintiff's failure to place said mattress on a metal foundation, and/or the removal of said mattress from an unhealthy; and/or unsanitary foundation thereof, would result in a disciplinary infraction from D.O.C.S. or retaliation (including physical bodily harm by a DOCS SWAT TEAM), or other form(s) of punishment(s). Plaintiff's only other recourse of action is/was to apply an generic analgesic balm, which offered no comfort and/or relief.
However, on or about the month of May 2016, plaintif received a copy of his medical record(s) from the period of 09/16/2015 through 04/26/2016, and discovered that the reason he was not being seen/treated for his back pain was because someone in the medical office had continuously signed a "Patient Refusal of Treatment" Form

indicating "Physical Therapy Reschedule"; and, "Patient Refuse to Sign", dated 02/12/2016, which plaintiff never saw before, nor "refused to sign", having never received a copy of the document at any time. (See enclosed "Patient Refusal of Treatment" Form, dated 02/12/2016, signed by a "Francis Jeanty, RPA"; and, "Abdul Madison, Associate Director Operations", marked herein as "Exhibit E"; along with the "NYC Health & Hospitals Summary Review, pp. 1-2, dated 02/12/2016, marked herein as "Exhibit F"; and, "NYC Health & Hospitals Summary Review", pp. 1-2, dated 02/10/2016, marked herein as "Exhibit G". In fact, two days prior, on 02/10/2016, plaintiff went to "Sick Call" to request to be RE-SCHEDULED for back therapy, and not to "refuse" treatment.

Plaintiff states herein that at no time did he refuse medical treatment/physical therapy for the chronic back pain he was subjected to, but instead discovered through obtaining his medical record(s) that DOC medical staff had been signing off on refusals made by someone other than plaintiff's knowledge and/or written consent, whom plaintiff wishes to now file malpractice against, including, but not limited to DOC; and/or its medical affiliates/staff whom are placed in charge of scheduling/re-scheduling said/such appointments (physical therapy).

The issue of medical malpractice and/or medical negligence within the Department of Correction is not a suddenly new phenomenon, as indicated on the 'Document VSS=Vital Signs Stable' Form, dated 09/18/2015, and marked herein as "Exhibit G1", where plaintiff was misdiagnosed as a "Polysubstance Dependant" (as indicated on the Document VSS); and, administered Librium, 50 mg. BID X2 days, then 25 mg. BID X2 days, then 25 mg. QHS X1 day, for a total of 5 day(s) period, beginning on 09/18/2015, and scheduled to end on 09/23/2015, as indicated in "Exhibit G1".

Plaintiff, upon admission into the custody of the Department of Corrections (DOC) only indicated that he "drinks socially"; and, "occasionally smoked marijuana" once or twice a year back in 1997 into the year 2000, but believes his urine sample might have gotten mixed up with another detainee/inmate's urine sample, in being administered Librium, and its effects thereof, for a five day period, which brought plaintiff's health into question, in turn, upon his arrival to the AMKC Facility; and, which now plaintiff requests for this Court's review, in bringing forth plaintiff's malpractice suit herein against the Department (DOC).

14. During the week of November 9, 2015 no lunch was served on Thursday, November 12, 2015, without explanation, despite being told/promised that the detainees in the entire housing area/unit would be compensated during dinner with a "double portion", which was not honored/true, nor did come to pass. Dinner was even served late (about 9:00ish, from its usual time of 5:00PM), and yet at one point, the entire housing area/unit (Quad 6 Upper) was on the brink of being served "cold cereal" (i.e. "corn flakes", without the milk) for dinner, as a result of the kitchen/messhall facility staff spilling dinner on the floor, while en-route to be delivered to the housing unit; and, in turn, not wanting to replace lunch or dinner, as we would all later come to learn, in further violation of the 'Inmate Handbook', revised 2007, pg. 20, entitled "Food Services", and marked herein as "Exhibit B". Plaintiff also filed a "311 Complaint" regarding paragraph(s) "14"

"15"; and, "16" herein, Service Request Number C1-1-1193585013 for this Court's review.

    15. For the past two weeks (during the month of December 2015), "Sick Call" services/"Health Service(s)" had not been called and/or provided, again, without any reasonable explanation as to why medical services were being denied, as per the 'Department of Correction Inmate Handbook', revised 2007, pp. 21-22, marked herein as "Exhibit C".
    Later it was learned that the medical staff at/for DOC (Corizon) were on strike due to contract disputes within the department, and that this had been the reason(s) medical provision(s) were being denied; and, not offered.
    During such time, plaintiff had been suffering from a severe ear ache/infection that was not properly treated in time; and, the first time plaintiff sought treatment, resulting in permanent hearing loss in his right ear. This after the infection traveled from the left ear to the right ear, where it progressively got worse, as a result of going untreated; and, not being prescribed the appropriate/effective medication(s)/anti-biotic(s).

    16. During the month of November 2015, plaintiff had sent out "Personal" as well as "Legal Correspondence" (Privileged/Confidential) from the AMKC Facility (C-95). Plaintiff had sought to send out "personal correspondence" to family/relatives, in attempting to ensure them periodically of his personal safety. Plaintiff also sought to send "Legal Mail" (Privileged/Confidential Correspondence) to his attorney, in further attempting to ensure his personal safety and well-being periodically, to no avail, as in many instances the outgoing mail was simply not being delivered from the facility as scheduled, in direct violation of 'Chapter 1 of the Title 40 of the Rules of the City of New York', pp. 27-30, Section § 1-11 (c)(4)(5); and, (d)(1), as recently amended, respectively, and marked herein as "Exhibit H1".
    In many instances during the month(s) of September through December 2015, plaintiff's attorney, as well as his relatives, would both confirm that his correspondence had either been tampered with, in further violation of Section § 1-11 (c)(6).
    At one point plaintiff had to write to an outside source in inquiring into the constant/persistent problem/violation(s) of mail tampering of both "incoming" and "outgoing" mail (See enclosed "Inmate Grievance", marked herein as "Exhibit(s) H2; and, H3"), even filing a "311 Complaint" on or about the week of November 9, 2015, Service Complaint Number: C1-1-1193585013, for this Court's review.
    Also, this issue of DOC violating plaintiff's incoming/outgoing mail under the particular guidelines and protocol(s) mentioned above, rose again during the month of March 2016, where a grievance(s) were filed accordingly, and marked herein as "Exhibit H4".

    17. Despite many pleas to promote sanitary living environment(s)/quarter(s) through the 'Inmate Delegate(s) Committee Program, the Department of Corrections (DOC); and, the defendant(s) named in the

above-mentioned caption herein, created an unsanitary living and eating (food handling/serving) environment when on February 18, 2016, during the serving of breakfast, a(n) detainee, Stephan Martinez (B&C#825-150-1152), was not properly instructed/trained to serve any of the meals, and instead, did not properly wash his hands while purposely dipping unsanitary plastic spoons into everyone's individual breakfast tray, despite repeated requests by the other detainees for inmate Stephan Martinez to please stop mishandling the food , and to please take a few minutes to wash/sanitize his hands, as well as the serving utensil(s), before serving the food/meal(s).

At that point, inmate Martinez became confrontational and irate; and, attempted to attack plaintiff with one of the serving utensils. Plaintiff tried to do his best to ward off further attack(s) by inmate Martinez, while defendant Officer Gray, Shield #18367, whom was working the midnight tour, was not at his assigned post at that particular moment that the incident occured. (See 'Injury to Inmate Report', dated 02/18/2016, marked herein as "Exhibit I"). When defendant C.O. Gray finally did intervene, he favored inmate Martinez over plaintiff, despite plaintiff presenting a valid sanitary issue, which the other detainees were in agreement with, to the area captain, defendant Captain Greaves, Shield #376.

Plaintiff's plea(s) for the meal(s) to be served in a more beneficial and/or healthy/sanitary manner were ignored by both defendant(s) Captain Greaves; and, defendant C.O. Gray. Plaintiff instead, was told to . . ."get with the program", insinuating that "the program" still exists between favored; and, select inmates (mostly gang affiliated), and steady housing officers (regular post), working in cohoots to help "run" (or otherwise purge) particular housing units.

As a result of the/this physical altercation with inmate Stephan Martinez (B&C#825-150-1152), in which inmate Martinez' blood landed on plaintiff's person and face, plaintiff, in turn, was subjected to being prescribed an "HIV coctail" for up to a thirty (30) day period, consisting of Augmentin Tablet(s), 875-125 MG, orally every 12 hours; Truvada Tablet(s), 200-300 MG, daily; and, Raltegravir Potassium Tablet(s), 400 MG, orally twice a day.

It is uncertain, to-date, if inmate Martinez is HIV positive.

Also, plaintiff was administered a(n) Tetanus Immune Globulin Injectable, 20 MCG/ML (the first of three injections on 02/18-2016), along with being prescribed a thirty (30) day supply of Multi-Vitamin, to counter the side-effect(s) of the HIV cocktail described above (See enclosed "NYC Health & Hospitals Summary View, pp. 1-3 (emphasis on "pg. 2"), dated 02/18/2016, marked herein as "Exhibit J").

Furthermore, plaintiff was initially infracted for the infracted for the incident of 02/18/2016, but the disciplinary disposition indicated that the charge(s) of "101.14: Fighting", was dismissed, despite being sentenced to serve twenty (20) days Punitive Segregation, despite the DISMISSAL (See enclosed 'Hearing Report and Notice of Disciplinary Disposition', dated 02/25/2016, marked herein as "Exhibit K").

18. Despite many pleas by the plaintiff to ensure his safety, the Department of Corrections (DOC); and, the defendant(s) mentioned in the above-referenced caption herein, created an unsafe living en-

environment for him when on February 28, 2016, plaintiff was housed in Quad 10 Lower at the AMKC Facility (C-95), where he was jumped by five or more inmates, and stabbed in the back of the head, by members of the Bloods gang, while sleeping in his cell, as a direct result of the "A Post" officer, defendant C.O. Dutch, Shield #8264, whom was working the 3:00PM-11:00PM Tour, carelessly took another inmate's word to open plaintiff's cell without his authorization/permission, leading to the assault/attack on plaintiff, as a result of plaintiff . . ."not getting with the program" (extortion/extorting of other inmates). The officer on duty, defendant C.O. Dutch, favoring; and, in cohoots with the "Bloods gang" in Quad 10 Lower, then tried to cover up the incident, by initially failing to write up an "Injury To Inmate Report".

Plaintiff then requested for Protective Custody, in hopes that this might ensure a higher level of his personal safety (See enclosed"Notice of Hearing Protective Custody Housing Form", dated 02/29/2016; and, signed by "Captain Nieves", Shield #399, and marked herein as "Exhibit M"). Also enclosed, see "Injury To Inmate Report", dated 02/28/2016, signed by Captain Jackson, Shield #1310, and marked as "Exhibit L").


19. On April 4, 2016, while being housed at 10 West, at the Manhattan House of Detention (MDC), located at 125 Worth Street, New York, New York 10013, plaintiff was exposed/subjected to the chemical agent known as "Sabre Aerosol Projector", also known as "MK-9", Classification #5410-R-F), during a random search of the housing unit by a DOC "Probe Team" (ESU). This chemical agent has also been known to be used to stop a wild animal the size of a grizzly bear in its tracks, and its use within the Department of Correction has been abusive, in unprovoked situations such as the 04/04/2016 search described aboove.

Plaintiff was not the intended target as the Probe Team unleashed several bursts, unnessarily, unprovoked; and, unconstitutionally, disbursed/used, as per DOC protocol, creating a continuous, injurious environment; and, emergency situation, as DOC, in turn, failed to provide medical attention to those detainees exposed to the chemical agent(s) released in a closed environment/quarters, with as little to ventilation, further resulting in intentional infliction, as well as cruel; and, unusual punishment.

The incident occured a second time on 04/06/2016. Only this time the incident was documented by medical personnel, as detainees exposed to the chemical agency "MK-9", protested to be afforded medical attention for the effect(s) that the chemical agent has on one's eyes, ears, nose, face; and,skin (See enclosed 'Injury To Inmate Report', dated 04/06/2016, marked herein as "Exhibit N"). A grievance was also filed dated 04/07/2016 (See enclosed 'Grievance', dated 04/07/2016, marked as "Exhibit N1"), in an attempt to address the abuse of the chemical agent (MK-9) being used in unnessasary/unprovoked situations, especially by unintended targets, such as the plaintiff herein.


20. During the week of May 23, 2016, while awaiting transfer from Metropolitan Detention Complex (Brooklyn House), located at 275 Atlantic Avenue, Brooklyn, New York 11231, back to the AMKC Facility

Plaintiff arrived the morning of May 24, 2016, at the AMKC Facility, having spent roughly 24 hours on the transport bus, as a result of his transfer papers not being in order. Plaintiff had to be driven back to Brooklyn House (MDC) during the night, only to be driven back to AMKC between 05/23/16 through 05/24/16, without ever boarding off the bus to use a restroom.

Once plaintiff finally did arrive at AMKC Facility to be housed, he spent an additional five days (more than the alloted 72 hours where a detainee MUST be housed upon arriving to a facility at Rikers Island) in "Intake", without being housed (given a bed).

Plaintiff instead spent the whole week sleeping on the floor in Intake until the morning of 05/29/2016. One of the "housing" issues over at AMKC was that DOC had been trying to house plaintiff back in 10 Lower, which is the same housing unit that plaintiff got jumped and stabbed while asleep, as described in "Paragraph 18" herein.

Also, plaintiff was not supposed to be re-housed in general population (Quad 10 Lower) back at the AMKC Facility, where that would put him at potential risk; and, again, put his safety at risk, as per 'Notice of Hearing Protective Custody Form', dated 02/29/2016, marked as "Exhibit M", which clearly stated that plaintiff's "safety [was] in jeopardy". The fact that plaintiff was being sent back to AMKC had already placed him at risk, but an even greater risk to house plaintiff back in the same housing unit (Quad 10 Lower), where he was jumped and stabbed in the back of the head, while asleep in a cell (See "Exhibit L", 'Injury To Inmate Report', dated 02/28/2016).

Plaintiff being transferred back to the AMKC Facility was a dangerous oversight by 'OSIU' (the entity/office that is in charge of, and/or that oversees "movement", or where a detainee is housed/placed).

Plaintiff's plea(s) to ensure his safety in a Protective Custody housing unit, fell on deaf ears, to every captain, deputy warden, and deputy warden of security, that passed through Intake, during the week of 05/23/2016, where plaintiff spent a whole week in the AMKC Intake, without being housed, in retaliation for him trying to get someone's attention that his safety was in jeopardy and at risk if he were to remain at that facility, and placed in "general population", instead of honoring his request to be housed in "Protective Custody", in ensuring his safety from further incident(s).

As stated above, plaintiff remained at the AMKC Facility's 'Intake', from 05/24/16 through 05/29/16 without being housed. On the morning of 05/29/16, plaintiff was again transferred to Brooklyn House for another "24 Hour Review" for "Protective Custody Status". While awaiting OSIU's decision, plaintiff filed a "311 Complaint" on Sunday, 05/29/2016, Complaint Service Number: C1-1-1256753515; and, again on 06/01/2016, Complaint Service Number: C1-112584841??, addressing the issue(s) mentioned above, along with the mistreatment suffered by plaintiff during that time.

### III. Injuries

21. The injury(ies) that plaintiff sustained are described in detail in "Paragraph(s) 13; 15; 17; 18; 19; and, 20" herein, and as indicated in specificity, the lack, and/or denial of medical attention/treatment in those incidents/instances.

## IV. Exhaustion of Administrative Remedy(ies)

22. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 12", as "Exhibit C1"; and, "Exhibit D1".

23. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 13", as "Exhibit(s) A2" (pp. 1-3).

24. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 14", as "Exhibit(s) B"; and, "Exhibit B1".

25. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 15", as "Exhibit(s) C"; and, "Exhibit C1".

26. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 16", as "Exhibit(s) H; H1; H2; H3; and H4".

27. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 18", as "Exhibit(s) M1" (pp. 1-3).

28. Pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), plaintiff did in fact file several grievance(s) addressing the issue(s) mentioned in "Paragraph 19", as "Exhibit(s) N"; and, N1" (pp. 1-5).

## V. Relief

29. Plaintiff herein, is seeking monetary compensation/damages in the amount of what it costs to house a detainee/prisoner per day (roughly $460.00 + taxes), for lost wages; medical malpractice/negligence; mental and physical anguish as described in "Paragraph(s) 12 through 20", herein.

## VI. Previous Lawsuits

30. Plaintiff herein, has not filed any previous lawsuit(s) in state and/or federal court(s), addressing and/or dealing with the same and/or similar fact(s) involved in this action, respectively.

I declare under penalty or perjury that the forgoing is true and correct.

ISAAC MORALES
(B&C#241-150-7561)
18-18 Hazen Street, AMKC
East Elmhurst, New York 11370

I declare under penalty and perjury that on this 3rd day of September, 2016, that I am delivering this complaint to be mailed to the Pro Se Office of the United States District Court for the Southern District of New York.

ISAAC MORALES







Isaac Morales (B+C#241·150·7561)
18-18 Hazen Street, AMKC
East Elmhurst, New York 11370

7015 1660 0001 1605 4557

United States District Court
Southern District of New York
500 Pearl Street, Room 200
New York, New York 10007
Attn: Clerk of the Court

Legal Mail

RETURN RECEIPT REQUESTED

